In re BILDISCO, a General
Partnership, Debtor.

GERBER INDUSTRIES, INC.,
Plaintiff-Appellant,

v.

BILDISCO, a General Partnership, and
Congress Financial Corp.,
Defendant-Appellants.

Civ. A. No. 81–942.
Bankruptcy No. 80–01283.

United States District Court,
D. New Jersey.

June 25, 1981.

Gideon Schiller, Clayton, Mo., John J. McLaughlin, Millburn, N. J., for Gerber Industries, Inc.

Jack M. Zackin, Ravin, Katchen & Greenberg, P. A., Newark, N. J., for Bildisco.

Walter J. Greenhalgh, Kleinberg, Moroney, Masterson & Schachter, P. C., Millburn, N. J., for Congress Financial Corp.

## OPINION

DEBEVOISE, District Judge.

Gerber Industries, Inc. [Gerber] appeals from an order of the Bankruptcy Court for the District of New Jersey holding that goods consigned by Gerber to the debtor Bildisco, a general partnership in the State of New Jersey [Bildisco], were subject to the claims of Bildisco's creditors. *Matter of Bildisco*, 7 B.R. 225 (U.S.Bkrtcy.Ct.N.J. 1980). For the reasons that follow, the Bankruptcy Court's order is affirmed.

I.

In October, 1979, Bildisco and Gerber entered into a written "Consignment Sale Agreement" which covered: "Consignment inventories of goods manufactured and shipped by Gerber Industries Secured Party to Bildisco ...". On December 31, 1979, Gerber filed a financing statement giving notice of that agreement; however, Gerber gave no actual notice of the consignment agreement to Bildisco's secured creditors, nor did Gerber post a sign at Bildisco's place of business declaring its ownership of the goods. Moreover, Bildisco was not gen-

erally known to its creditors to be a seller of goods on consignment.

Less than four months later, on April 14, 1980, Bildisco filed a Voluntary Petition for Reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.* On April 17, 1980, the Bankruptcy Court entered a judgment establishing that by virtue of two financing statements filed by appellee Congress Financial Corporation [Congress] with the Secretary of State on December 14, 1976 and on December 10, 1979, Congress held a valid and duly perfected security interest in various assets of the debtor. Included in these assets were the consigned Gerber products. Gerber, however, was not a party to that proceeding.

On April 28, 1980, Gerber instituted an adversary proceeding in the Bankruptcy Court against Bildisco and Congress, seeking possession of the goods delivered to Bildisco pursuant to the "Consignment Sale Agreement" and a determination that its interest in the goods was paramount to that of Congress.

After a trial, the Bankruptcy Court, in a written opinion, concluded that Gerber's failure to give written notice to Congress of its intention to deliver goods on consignment to Bildisco rendered the goods subject to the rights of Bildisco's creditors.

## II.

Gerber attacks the Bankruptcy Court's decision on three grounds. As its first ground, Gerber argues that Congress failed to establish in the bankruptcy proceeding that it had a security interest which attached to the Gerber products. Specifically, Gerber argues that Congress failed to show (i) that it had a security interest, (ii) that value had been given, (iii) that the security interest in after-acquired property was not given for an antecedent debt, and (iv) that it gave new value at the time Bildisco obtained possession of the Gerber products or that the Gerber-Bildisco sale was in the ordinary course of business.

■ The merits of these arguments, however, need not be reached. Before Gerber filed its complaint, the Bankruptcy Court had entered a judgment establishing that Congress held a perfected security interest in, among other assets, the after-acquired inventory and building materials of the debtor. Gerber's complaint did not challenge the validity of the Court's judgment. Instead, Gerber sought a determination that it was the owner of the consigned goods and that its interest in those goods was superior to that of Congress. Since Gerber based its complaint on the priorities to be accorded the conflicting interests in the goods, and not on the validity of Congress' security interest, Gerber may not raise this issue for the first time on appeal. *See Matter of Fowler*, 407 F.Supp. 799, 805 (W.D.Okla.1975). *Compare* Bankruptcy Rule 810 with its predecessor, Bankruptcy General Order 47 (under the new rule the receipt of further evidence by the district judge on a review of the findings made by the Bankruptcy Court is no longer authorized).

## III.

As its second ground for reversal, Gerber submits that the Bankruptcy Court erred when it treated the consignment as a security interest and applied the provisions of N.J.S.A. 12A:9–312 which require that written notice be given by the holders of a purchase money security interest to parties claiming under an after-acquired property clause. Gerber argues that the consignment between itself and Bildisco was a "true" consignment and that, as such, the proper procedure under New Jersey's Uniform Commercial Code was to comply with N.J.S.A. 12A:2–326 and require a consignor to follow the "filing" provisions of Article 9 and not any other action for perfection. Since Gerber filed a financing statement on December 31, 1979 for its consignment inventory, Gerber concludes that its interests in the consigned goods are superior to that of Congress.

In its decision, the Bankruptcy Court, with little discussion, found the Gerber-Bil-

disco consignment agreement, like all consignments, to give a " 'kind of security interest" in the consignor. *Matter of Bildisco, supra,* at 227. Assuming the validity of that determination, section 9–312 of the Code would be applicable for it expressly assigns priorities among conflicting security claimants to the same collateral.

Section 9–312(3) provides:

A purchase money security interest in inventory collateral has priority over a conflicting security interest in the same collateral if

(a) the purchase money security interest is perfected at the time the debtor receives possession of the collateral; and

(b) any secured party whose security interest is known to the holder of the purchase money security interest or who, prior to the date of the filing made by the holder of the purchase money security interest, had filed a financing statement covering the same items or type of inventory, has received notification of the purchase money security interest before the debtor receives possession of the collateral covered by the purchase money security interest; and

(c) such notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.

N.J.S.A. 12A:9–312(3).

■ By virtue of Section 9–107, a security interest in the consigned goods would be a purchase money security interest since the rights in consigned goods are reserved "to secure all or part of its price". The consigned goods are "inventory" as defined by Section 9–109(4), which includes goods held "for sale or lease". Congress has a conflicting security interest in those goods. Thus, if Gerber's consignment to Bildisco creates a security interest, under Section 9–312(3) Gerber would be required, in addition to perfecting its security interest before the collateral reached the hands of the consignee, to notify Congress, as a known secured party, of its consignment. *See Manufacturers Accept. Corp. v. Penning's Sales, Inc.,* 5 Wash.App. 501, 487 P.2d 1053 (1971).

Gerber challenges the Bankruptcy Court's characterization of the consignment agreement as a security interest on the basis that the terms of the agreement, as well as the parties' conduct with respect to the agreement, evidence no intent to create security interests in the consigned goods. Gerber views the consignment as a "true consignment" by stressing that the agreement provides:

for title to remain in Gerber;

for the inventory to be clearly marked as Gerber's;

for the inventory to be segregated from all other goods of the debtor;

for periodic inspections of the inventory to be made by Gerber;

for monthly reports to be made by Bildisco;

for concurrent payments to be made by Bildisco to Gerber "for the merchandise sold from each such inventory sixty (60) days from the invoice date";

for the balance of inventory to be made by exchanging merchandise with inventory already delivered.

■ Characterization of the Gerber-Bildisco consignment, however, does not require resolution as it is not determinative of the outcome of this appeal. Even if the consignment at issue was intended to create a true consignment without any security interest in the consignor, the same policy considerations which require that a holder of a purchase money security interest give the secured creditors written notice of that interest are applicable to a true consignment and suggest that the same procedures be followed in order to prevent the consignee's creditors from establishing greater rights in the consigned goods.

Article 2 governs the relative rights of the parties in a true consignment situation. The relevant section, 2–326, provides:

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(a) a "sale on approval" if the goods are delivered primarily for use, and

(b) a "sale or return" if the goods are delivered primarily for resale.

(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Chapter on Secured Transactions (Chapter 9).

That section recognizes the ability of consignments to hide the consignor's interests to the detriment of creditors—even where the transaction is not intended to create a security interest—and thus requires the consignor to take one of three steps to perfect his rights. Failure to perform one of these steps makes the consignor's interest inferior to the claims of the consignee's creditors, while perfecting the interests renders the section inapplicable. This negative statement does not clarify the relationship between the prior-in-time secured creditor and the consignor. It may mean that perfection immunizes the consigned goods from all attacks made by creditors (including those prior in time) or only from those attacks by creditors whose claims were made after perfection (thus recognizing the basic law that prior in time is prior in right). It may also mean that an exception is recognized by giving the consignor, like the purchase money security interest holder, priority over an earlier created and perfected interest in after-acquired property, provided that actual notice of the consignment is given to prior in time secured parties. Thus, there was a gap in Section 2–326 at the time pertinent to this case.

Section 2–326 does not suggest how this matter of priority is to be handled, and no cases dealing directly with this point have been found. To fill the gap we should look to an analogous situation in the Code and the policy considerations underlying it— purchase money security interests and section 9–312.

In considering the relationship of a secured party vis-a-vis a holder of a purchase money security interest, the drafters of the Code recognized that purchase money security interests may put secured parties with an after-acquired property clause in inventory to a serious disadvantage. These secured parties are quite susceptible to the loss of their collateral through the replacement of inventory on a purchase money security basis and, unless notified of this change, may be lulled into a false sense of security. If notified, however, the secured parties can protect their rights by acting quickly to correct or salvage the situation. To protect against an unfair dissipation of a creditor's collateral in inventory, the Code requires that actual notification be given. These considerations are equally applicable to all kinds of consignments.

Consignors, like holders of a purchase money security interest, enable a consignee secretly to replace inventory with goods on consignment and thereby undermine the secured party's position of priority in the inventory. Requiring that consignors, in addition to filing, check for and notify secured parties with conflicting interests of the con-

signment is a reasonable and workable answer for the problem at hand. Moreover, this resolution permits all consignments— those creating security interests and those which do not—to be treated in the same manner. *See*, Hawkland, Uniform Commercial "Code" Methodology, *Univ. of Ill.Law Forum*, vol. 1962, pp. 314–320 (1962).

Further support for the conclusion that the gap which existed in Section 2–326 should be filled by analogizing the situation to that covered in Section 9–312(3) is found in UCC 9–114, which was adopted by the New Jersey Legislature after the events in the instant case took place. Laws 1981, c. 138, § 11. That section of the Code treats goods on consignment like purchase money security interests and requires both filing and actual notice to the prior in time secured party. While this legislation does not directly control the requirements for perfection applicable in the present case, it may be considered in seeking to determine how the New Jersey courts would have construed Section 2–326, *cf., Shell Oil Co. v. Marinello*, 63 N.J. 402, 409, 307 A.2d 598 (1973).

As the Bankruptcy Court pointed out, the authors of the amendment recognized that uncertainty existed under the Code as originally drafted whether the filing rule in Section 2–326(3) applicable to true consign-

ments required only filing under Part 4 of Article 9 or also required notice to prior inventory secured parties of the debtor under Section 9–312(3). It could be argued, as Gerber does, that the amendment requiring notice demonstrates that prior to the amendment no notice was required. I think the better view is that prior to the amendment there was a gap in the law, and the manner in which that gap should be filled is suggested not only by the policy considerations referred to above but also by the statutory amendment which ultimately clarified the statute.

For these reasons, whether the consignment agreement between Bildisco and Gerber is viewed as a purchase money security interest or a true consignment, notice was required to give Gerber priority over Congress.

The order of the Bankruptcy Court will be affirmed.*

Appellee's counsel is requested to submit an appropriate form of order.

---

* At oral argument Gerber's counsel agreed that if the Court found Congress' claims to be superior, there would be no need to resolve the issue whether Bildisco's rights were superior to the rights of Gerber. This was Gerber's third ground for attacking the order of the Bankruptcy Court.